UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

**PORTUS SINGAPORE LTD.**

*Plaintiff,*

v.

Case No. 1:16-cv-06865-JGK

**KENYON & KENYON LLP**

*Defendant.*
_____


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S <u>MOTION FOR SUMMARY JUDGMENT</u>


**BARCLAY DAMON LLP**
*Attorneys for Defendant,*
The Avant Building
200 Delaware Avenue
Buffalo, New York 14202
Telephone: (716) 566-1300

Dennis R. McCoy
 *of Counsel*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................... 1

SUMMARY OF FACTS ................................................................. 1

STANDARD FOR SUMMARY JUDGMENT.................................................. 6

ARGUMENT ......................................................................... 7

   I.   Plaintiff's Complaint Must be Dismissed Due to a Lack of Expert
      Testimony……………………………………………………………......................7

      A. Plaintiff's Liability "Expert" is Not Qualified……………………………………..7

      B. Plaintiff's Damages Expert Testimony Relies on Hearsay, is Based on
      Unsupported Assertions and Assumptions, Ignores Relevant Evidence,
      and is the Product of a Flawed Analysis ................................... 8

   II.   Defendant Did Not Commit Legal Malpractice under New York Law................. 8

      A.   Kenyon Successfully Fulfilled the Retainer and Direction from
         Plaintiff's Australian Counsel to Obtain a United States Patent For
         Portus ................................................................. 9

      B.   Kenyon's Filing of a National Stage Application was Within the
         Applicable Standard of Care ......................................... 12

      C.   The Standard of Care Cannot be Determined by Hindsight  …………………14

      D.   There is No Evidence that a Bypass Continuation Application Should have Been
         Filed after June, 2001………............................................................15

   III.   Plaintiff Did Not Sustain Real and Ascertainable Damages................................. 17

CONCLUSION....................................................................20

CERTIFICATION ...............................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmBase Corp. v. Davis Polk & Wardwell*,
    8 N.Y.3d 428 (2007) ...............................................................................................8, 19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (U.S. 1986).............................................................................................10

*Andrew Garrett Holding Corp. v. Singer*,
    2005 N.Y. Misc. LEXIS 3255 (Sup. Ct., N.Y. Cnty, 2005) ......................................9

*Attallah v Milbank, Tweed, Hadley & McCloy, LLP*,
    168 A.D.3d 1026 (2d Dep't 2019) ...............................................................................9

*Carey v. Crescenzi*,
    923 F.2d 18 (2d Cir. 1991)...........................................................................................6

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1985).....................................................................................................6

*Darby & Darby, P.C. v. VSI Intl., Inc.*,
    95 N.Y.2d 308 (2000) ...........................................................................................12, 14

*Douglas v. New York Dep't of Corrections*,
    1990 U.S. Dist. LEXIS 7080 (S.D.N.Y. 1990)..........................................................16

*Ehlinger v. Ruberti, Girvin & Ferlazzo, P.C.*,
    304 A.D.2d 925 (3d Dep't 2003) .................................................................................7

*Giambrone v. Bank of NY*,
    253 A.D.2d 786 (1998) ...............................................................................................16

*Goldberger Co., LLC v. Uneeda Doll Co.*,
    2017 U.S. Dist. LEXIS 114109 (S.D.N.Y. 2017).....................................................11

*House v. Wackenhut Servs.*,
    2012 U.S. Dist. LEXIS 130879 (S.D.N.Y. 2012)........................................................6

*IGEN v. White*,
    250 A.D.2d 463 (1998) ...........................................................................16, 17, 18, 19

*Kasper v. Damian*,
    689 F. Supp. 2d 492 (W.D.N.Y. 2010) ......................................................................14

*Knight v. United States Fire Ins. Co.*,
 804 F.2d 9 (2d Cir. 1986)...................................................................................6

*McCoy v. Feinman*,
 99 N.Y.2d 295 (2002) ................................................................................8, 9

*Middle Mkt. Fin. Corp. v. D'Orazio*,
 2002 US Dist. LEXIS 17817 (S.D.N.Y. 2002) .................................................7

*Nordwind v. Rowland*,
 2007 U.S. Dist. LEXIS 75764 (S.D.N.Y. 2007) ...........................................8, 9

*O'Shea v. Brennan*,
 2004 U.S. Dist. LEXIS 8919 (S.D.N.Y. 2004) .................................................8

*Power Specialty Co. v. Connecticut Light & Power Co.*,
 80 F.2d 874 (2d Cir. 1936)...............................................................................17

*Ressis v. Wojick*,
 105 A.D.2d 565 (1984) .....................................................................................16

*Schadoff v. Russ*,
 278 A.D.2d 222 (2d Dep't 2000) .......................................................................7

*Warshaw, Burstein, Cohen, Schlesinger & Kuh v. Kessner*,
 214 A.D.2d 472 (1st Dep't 1995) ......................................................................9

**Statutes**

35 USC §111(a) ......................................................................................................5

35 USC §371.....................................................................................................5, 16

## PRELIMINARY STATEMENT

Defendant Kenyon & Kenyon LLP ("Defendant" or "Kenyon") submits this Memorandum of Law in support of its motion for summary judgment to dismiss Plaintiff Portus Singapore Ltd.'s ("Plaintiff" or "Portus") third amended complaint.

## STATEMENT OF FACTS

On June 15, 2001, Kenyon received a fax totaling 43 pages from Peter Treloar, the Australian intellectual property attorney for Portus Pty Ltd. *See* Atty. Decl. Ex. A-14. In this fax, Mr. Treloar specifically directed Kenyon "to enter the National Phase in the United States on behalf of our client . . . ." *Id.* at pp. 1-2. On June 15, 2001, Dervis Magistre, Esq., an associate with Kenyon filed a national stage application, exactly as directed. *See* Atty. Decl. Ex. I. at p. 35; *see also* Atty Decl. Ex. A-15 at pp. 3-5. On June 19, 2001, Mr. Magistre wrote to Mr. Treloar advising: "We have entered the National Phase in the United States with respect to the above-referenced PCT application." *See* Atty. Decl. Ex. A-15 at pp. 1-2. Over 13 years later, having overcome multiple rejections by the USPTO, Kenyon obtained a United States patent for the plaintiff. *See* Atty. Decl. Ex. K. For this, Kenyon has been sued.

The Plaintiff is a failed company. It has never made money. *See* Att. Decl. Ex. A. at pp. 45-46; 69-76; 204-208; 217; 222; 231-237; 240; *see also Atty*. Decl. Ex's. A-37; A-38; A-46; A-49; A-50; A-62; A-65; A-69; A-118. It is presently the owner of four patents, all for the same invention: one from Australia, one from the European Union and two from the United States. *See* Atty. Decl. Ex. K; *see also* Atty. Decl. Ex. A. at pp. 78-79; 84. It has never produced a commercially available product based upon any of these patents. *See* Atty. Decl. Ex. A. at pp. 82; 86; 102; and 109. In 2012, the plaintiff abandoned any attempt to commercialize the invention.

*See* Atty. Decl. Ex. A. at pp. 41; 78; 82-83; 93; 141. Instead, it decided to "monetize" the patent. *See* Atty. Decl. Ex. A. at p. 41.

After four years, from 2015 to 2018, inclusive, plaintiff actively pursued the monetization campaign. *See* Atty. Decl. Ex. A. at pp. 116-120.  A total of only three sublicenses, to Apple, Comcast and Cisco, had been sold. *See* Atty. Decl. Ex. A. at p. 129. These sublicenses granted rights to all of its patents, worldwide for a one-time fee of $50,000. *See* Atty. Decl. Ex. A. at pp. 125-126.

After being rejected by at least ten law firms, in 2018, the Plaintiff engaged the five lawyer Dallas Texas firm of Ni, Wang & Massand to undertake an enforcement campaign, on a contingent fee basis. *See* Atty. Decl. Ex. A. at pp. 93-94; 111-116.   Four lawsuits were commenced by this firm in 2019, alleging infringement of plaintiff's patents, and are still pending.

This action, based on hindsight and speculation, is an attempt by Plaintiff to derive income by suing its former lawyers, when it has been unable to make money any other way. Kenyon provided exactly the legal services requested, and obtained the result which the Plaintiff asked it to obtain. This action seeks to impose other obligations on Kenyon, which are clearly outside the scope of its engagement.   Kenyon was not negligent and the plaintiff has not sustained any damages.

**Portus and its Patent**

In 1998, Cameron Lindquist and his brother Timothy retained Peter Treloar, an Australian lawyer specializing in intellectual property, to patent a concept that the Lindquist brothers had conceived. *See* Atty. Decl. Ex. A. at pp. 56; 130.  Portus Pty Ltd. incorporated on November 2, 1998.  Mr. Treloar filed a patent application in Australia on December 17, 1998

and then filed an application under the Patent Cooperation Treaty ("PCT") in 1999, permitting the inventors to obtain patents in the United States and the European Union, among other jurisdictions.

In November, 2002, Portus Singapore PTE. Ltd. the plaintiff herein, was formed. *See* Atty. Decl. Ex. A-9. The rights to the Australian and US patents were assigned to it by Timothy and Cameron Lindquist. *See* Atty. Decl. Ex. A. at pp. 130-131.  This company participated with a consortium of companies and won one of the prizes in a Programme run by the Singapore government. *See* Atty. Decl. Ex. A. at pp. 14; 18-19. The system that was entered in the Programme was referred to as "an electronic series gateway." *See* Atty. Decl. Ex. A. at p. 9. A few years after developing the electronic series gateway, Portus left Singapore without any business. *See* Atty. Decl. Ex. A. at pp. 11-22.

Over the years, Portus participated in various trials with various companies in Australia to commercialize the invention. *See* Atty. Decl. Ex. A. at pp. 23-30; 82; 140-142.  These were unsuccessful. *See id*.

Over the years, Portus attempted to attract investors to provide capital necessary to commercialize the invention in Australia. *See* Atty. Decl. Ex. A. at pp. 17-18. These were unsuccessful. *See id*.

Over the years, Portus explored bringing an action to enforce its patent rights in Australia, even going so far as to get an opinion from Australian counsel. *See*. Atty. Decl. Ex. A. at pp. 91; 218-220; 242-244; 247.  It never did so. *See id*. at pp. 78-79; 80-81; 91-92; 126-127.

Over the years, Portus tried to get companies in Australia to enter into license agreements for its patent. *See* Atty. Decl. Ex. A. at pp. 242-243. No company entered into a license agreement. *See* Atty. Decl. Ex. A. at p. 245.

In 2012 the shareholders of Portus decided to abandon any attempt to commercialize the invention.  *See* Atty. Decl. Ex. A. at pp. 139-140.

In 2014, when it was clear that the U.S. patent would in fact be issued, Aaron Grunberger, the Kenyon associate working on the prosecution at the time, sent an e-mail to Timothy Lindquist, who was the director of Portus Singapore. *See* Atty. Decl. Ex. H-1.  In his email, Mr. Grunberger stated**:**

> Hi Tim,
>
> I have been looking into what we can do to get you some extra patent term. **<u>This is a long shot</u>**, but we may be able to file a petition under 37 CFR 181 to convert your application from a "national stage" of the PCT application under 35 USC 371 to a regular U.S. patent application claiming benefit as a continuation of the PCT application under 35 USC 111 and 120. If we can get this petition granted, the patent term adjustment rules which went into effect May 29, 2000 would apply to your applications, which potentially can add a significant percentage of term (I have not yet done the calculation). Please let me know if you would want us to continue to look into this course of action. If so, it should be done as soon as possible.
>
> Best Regards,
> Aaron Grunberger

(emphasis added). *Id*. Prior to this time, neither Portus nor Mr. Treloar requested any advice or information regarding patent term, or alternate ways to file for patent protection.

After the patent was obtained, Portus asked Kenyon to undertake an enforcement campaign on a contingent fee basis. *See* Atty. Decl. Ex. A. at pp. 113-114.  It declined to do so. *See id*.

In 2015, Portus retained the services of Global IP Law to monetize the patent, having previously abandoned any attempt to commercialize the invention, due to a lack of investor interest. *See* Atty. Decl. Ex. A. at pp. 117-120. Over three years, attempts to sell the patents of

Portus, or to license them, were undertaken, with many companies contacted. *See*. Atty. Dec. Ex. A-103. Finally, an agreement was entered with AST to offer sub licenses to its member companies for a one-time fee of $50,000.  *See* Atty. Decl. Ex. A. at pp. 124-126. Despite this minimal fee, only three sub licenses were sold. *See* Atty. Decl. Ex. A. at p. 129. After paying Global IP their contingency fee, Portus netted less than $50,000 per sublicense. *See* Atty. Decl. Ex. A. at 129-130.

In mid-2017, Global IP terminated its relationship with Portus. *See* Atty. Decl. Ex. A. at p. 120. Mr. Lindquist once again searched for a law firm which would agree to undertake an enforcement campaign on a contingent fee basis.  After being rejected by ten or more firms, Portus finally entered into an agreement with the five lawyer firm of Ni Wang Massand. *See* Atty. Decl. Ex. A. at pp. 93-94; 111-116.

This action was commenced on August 31, 2016. Defendants made two motions directed to the pleadings.  On 19TH day of July, 2018 a third amended complaint was filed.  The claims sound in legal malpractice.  Plaintiff alleges that Kenyon committed malpractice when it filed an application for a United States patent on June 15, 2001.  More particularly, plaintiff alleges that Kenyon's filing of an application pursuant to 35 USC 371, instead of an application pursuant to 35 USC 111(a) violated the standard of care and caused plaintiff "actual" damages.  It is alleged that plaintiff would have been granted an additional 3.5 years of patent term if the latter type of application had been filed.  It is further alleged that "Defendant could have mitigated the effects of their mistake at any time by filing a § 111(a) application before the patent eventually issued on December 16, 2014**."** Pl. Compl. ¶ 34.

## STANDARD FOR SUMMARY JUDGMENT

A moving party is entitled to judgment as a matter of law when there is no genuine issue as to any material fact presented in evidence based upon the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1985). A motion for summary judgment is appropriately granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (U.S. 1986) (internal citations omitted). Furthermore, "where a plaintiff cannot establish an essential element of his claim, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *House v. Wackenhut Servs.*, 2012 U.S. Dist. LEXIS 130879 (S.D.N.Y. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986)).

A nonmoving party cannot avoid summary judgment by relying on allegations, denials, conjectures or conclusory statements. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986); *see also Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (explaining that to avoid summary judgment, a party must demonstrate more than some "metaphysical doubt" as to the facts). A plaintiff's bald assertions, unsupported by evidence, are not enough to overcome a motion for summary judgment. *See Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12-15 (2d Cir. 1986) (holding that speculative assertions on which plaintiff relied were insufficient to withstand summary judgment).

Here the facts are not in dispute. Kenyon was instructed by Portus, through its Australian counsel, to file a specific type of application to obtain a United States patent. *See* Atty. Decl. Ex.

A-14. Kenyon did just that. *See* Atty. Decl. Ex. A-15.  Portus is a company with an invention that was never commercialized or marketed, because no one, not in Australia, and not in the United States, thought it was valuable enough to support with their money.  Portus is a failed business. This case is based on hindsight and speculation, and should be dismissed.

## ARGUMENT

### I.        Plaintiff's Complaint Must be Dismissed Due to a Lack of Expert Testimony

Kenyon refers the Court to the arguments in the companion Motion to Strike.

#### A.  Plaintiff's Liability "Expert" is Not Qualified

Kenyon's alleged departure from the standard of care must be proven through competent expert testimony. *See Middle Mkt. Fin. Corp. v. D'Orazio*, 2002 US Dist. LEXIS 17817, at *21 (S.D.N.Y. 2002) ("expert testimony is ordinarily required in a legal malpractice case concerning the issue of defendant's departure from acceptable professional standards"; *see also Ehlinger v. Ruberti, Girvin & Ferlazzo, P.C.*, 304 A.D.2d 925, 926 (3d Dep't 2003) (Plaintiff's papers failed to raise a question of fact since no expert affidavit describing the appropriate standard of care was introduced); *Schadoff v. Russ*, 278 A.D.2d 222, 223 (2d Dep't 2000) (Summary judgment was granted where plaintiff's papers failed to include an expert affidavit delineating the standard of care, leaving plaintiff's arguments conclusory and unsubstantiated). Thus, this case must be dismissed since Plaintiff fails to set forth an "expert" in admissible form to opine on the standard of care.

If the Court precludes Ms. Cox as an expert and strikes her opinions, an essential element of the cause of action cannot be established, and Plaintiff's complaint must be dismissed.

**B. Plaintiff's Damages Expert Testimony Relies on Hearsay, is Based on Unsupported Assertions and Assumptions, Ignores Relevant Evidence, and is the Product of a Flawed Analysis**

"…[E]xpert testimony must be introduced to establish…*whether the defendant's negligence proximately caused any damages to the plaintiff*. (emphasis added). *O'Shea v. Brennan*, 2004 U.S. Dist. LEXIS 8919, at *8 (S.D.N.Y. 2004). The court in *O'Shea* dismissed a legal malpractice counterclaim and opined:

> even if…acts or omissions were obviously negligent, it would not be clear without expert testimony whether such negligence was the proximate cause of any alleged damages. That is, without expert testimony, it is unlikely that a jury could conclude whether, but for [the] failure to file timely, [defendant] would have been successful in a defamation action in New York, had such an action been commenced…

(emphasis added). *Id*. at *9-*10.

In *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc*., this Court noted "[Plaintiff]…failed to present any evidence from which a reasonable jury could find that they suffered any damages from any of the claims they have asserted against the defendants." 331 F. Supp. 3d 221, 235 (S.D.N.Y. 2018).

Here, Portus has failed to provide expert testimony that Kenyon's alleged negligence proximately caused any damages. Without an expert on the issue, Plaintiff has no evidence of damages in this case. Plaintiff's action should be dismissed.

## II.     Defendant did not Commit Legal Malpractice under New York Law

Plaintiff must prove four elements to sustain this action for legal malpractice: (1) the existence of an attorney-client relationship; (2) Defendant "failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession;" (3) Plaintiff suffered damages "but for" Defendant's negligence; and (4) Plaintiff incurred real and ascertainable damages. *AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 434 (2007); *see*

*also McCoy v. Feinman*, 99 N.Y.2d 295, 301-302 (2002); *Nordwind v. Rowland*, 2007 U.S. Dist. LEXIS 75764, at *22 (S.D.N.Y. 2007). The record shows that Kenyon did not commit malpractice, and there is no evidence of any damage to Plaintiff. Thus, this case should be dismissed.

### A. Kenyon Successfully Fulfilled the Retainer and Direction from Plaintiff's Australian Counsel to Obtain a United Stated Patent For Portus

An attorney-client relationship between Portus and Kenyan was created on June 15, 2001 when Portus' Australian counsel, acting as the attorney and agent of Portus, specifically engaged Kenyon for the limited purpose of filing a national stage patent application. *See* Atty. Decl. Ex. A-14. It is well settled in New York that a lawyer who provides legal services consistent with the terms of its engagement cannot be held liable for failing to provide other services beyond the scope of that engagement. *See AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 432 (2007); *see also Attallah v Milbank, Tweed, Hadley & McCloy, LLP*, 168 A.D.3d 1026, 1028-1029 (2d Dep't 2019) ("An attorney may not be held liable for failing to act outside the scope of the retainer"); *Warshaw, Burstein, Cohen, Schlesinger & Kuh v. Kessner*, 214 A.D.2d 472, 473 (1st Dep't 1995) (the court rejected a malpractice claim where an attorney acted in a manner by which he was directed to act); *Andrew Garrett Holding Corp. v. Singer*, 2005 N.Y. Misc. LEXIS 3255, at *6 (Sup. Ct., N.Y. Cnty,, 2005) ("An attorney is not liable for malpractice based on acts performed at the client's direction"). In this case, Defendant was successful in filing a national stage application and obtaining a U.S. patent: exactly what it was retained to do. *See* Atty. Decl. Ex. A-15; *see also* Atty. Decl. Ex. A-14; *see generally* Atty. Decl. Ex. K.

In *AmBase Corp.,* the defendant law firm was sued for legal malpractice after successfully litigating a tax dispute on behalf of its client. *AmBase Corp.*, 8 N.Y.3d 428, 432 (2007). The alleged malpractice was based on the defendant law firm's failure to notify the

plaintiff client that they were only secondarily liable for the underlying tax dispute, and thus were not responsible for the litigation costs. *Id.* at 433.  In response, the defendant law firm argued they were specifically retained to litigate whether taxes were due, not to determine who was responsible for the same. In holding in favor of the defendant law firm, the court held:

> The plain language of the retainer agreement indicates that Davis Polk was retained to litigate the amount of tax liability and not to determine whether the tax liability could be allocated to another entity. Thus, the issue whether plaintiff was primarily or secondarily liable for the subject tax liability was outside the scope of its representation. As such, defendants exercised the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession when they focused their efforts on the controversy between [the plaintiff client] and the IRS--the subject of the retainer agreement.

*Id.* at 435.

Here, Defendants were specifically retained on June 15, 2001 by the Plaintiff through its Australian law firm Freehills, Carter, Smith, and Beadle  to "proceed to enter the National Phase in United States on behalf of [Plaintiff] and in accordance with the details shown in the attached sheet." Atty. Decl. Ex. A-14. The scope of the legal services requested is specific and narrow. Defendant accepted this engagement and filed a national stage application on June 15, 2001, for a United States patent, which was issued on December 16, 2014. *See* Atty. Decl. Ex. A-15; *see also* Atty. Decl. Ex. K. Defendant did exactly what it was retained to do. Therefore, Defendant could not have committed malpractice.

Kenyon was not asked to do anything beyond filing a national stage application, as directed in the June 15, 2001 letter from Plaintiff's Australian attorney. *See* Atty. Decl. Ex. A-14. Kenyon accepted this engagement on June 15, 2001 by filing the national stage application, as directed. *Id.* at Ex. A-15. By letter dated June 19, 2001, a Kenyon attorney advised: "[w]e have

entered the National Phase in the Unites States with respect to the above-referenced PCT application. *Id.*

The decision to obtain a U.S. patent was made as a result of consultation between Portus and its Australian intellectual property counsel before Kenyon was approached on June 15, 2001. Portus was aware that its Australian counsel would contact counsel in the United States to assist Australian counsel in this process. *See* Atty. Decl. Ex. A. pp. 56-57. As Mr. Lindquist testified on behalf of Portus in his 30(b)(6) deposition:

> Q: Okay. Now, in terms of making an arrangement with Kenyon & Kenyon to work on behalf of Portus, were you personally involved in that in 2001?
>
> A (Mr. Lindquist): This was part of the process that was initiated with Peter Treloar, who was our Australian patent attorney. The process was simply that we filed our Australian patent. Then we started the PCT process. And at the end of that, there was a national entry into each designated state or country, whatever you call it. So we just knew that this is what had to happen at this time. One was made for the U.S. One was made for Europe.
>
> Q: So my question to you, sir, is whether you were personally involved in contacting Kenyon & Kenyon for the U.S. part of that process.
>
> A (Mr. Lindquist): No. Peter Treloar made all the arrangements. Kenyon & Kenyon was the U.S. associate for – was part of Peter Treloar of his firm's foreign international associate network.

*Id.* "A 30(b)(6) witness testifies as a representative of the entity, *his answers bind the entity* and he is responsible for providing all the relevant information known or reasonably available to the entity." (internal citations and quotations omitted). (emphasis added). *Goldberger Co., LLC v. Uneeda Doll Co.*, 2017 U.S. Dist. LEXIS 114109, at *18-19 (S.D.N.Y. 2017). Portus knew there was a process that would occur in the United States, but did not insist on direct contact with

counsel there, but rather left this up to its Australian attorney. *See* Atty. Decl. Ex. A. at pp. 61-62.

Plaintiff has attempted to hide the exchange of letters between its Australian counsel and Kenyon in June, 2001, which reflect the limited scope of work to be done by Kenyon. *See* Atty. Decl. Ex. A-75; *see also* Atty. Decl. Ex. H-1. These letters and the direction to file a national stage application are not mentioned in any of the four versions of Plaintiff's complaint. Despite the fact that three former Kenyon attorneys, including Dervis Magistre, who signed the June 19, 2001 letter back to Plaintiff's Australian counsel, were all deposed, no questions were asked about either of these letters. *See* Atty. Decl. Ex. D-4; *see generally* Atty. Decl. Ex's. D, E, and I. Finally, and perhaps most telling, Plaintiff's attorneys in this action did not provide these letters to their client's liability expert in this action. *See* Atty. Decl. Ex. C. at pp. 76-78.

## B. Kenyon's Filing of a National Stage Application was Within the Applicable Standard of Care

"[W]hat constitutes ordinary and reasonable skill and knowledge cannot be fixed with precision, but should be measured at the time of representation." *Darby & Darby, P.C. v. VSI Intl., Inc.*, 95 N.Y.2d 308, 313 (2000). Thus, the standard of care must be measured by how other patent prosecutors under the same or similar circumstances filed applications in June, 2001.

Here, the evidence of the standard or practice is established by objective evidence. Out of 44,271 patent applications filed with the USPTO on or after May 29, 2000 with a priority claim to a Patent Cooperation Treaty application that was filed before May 29, 2000, 38,523, or a little over 87%, were filed as national stage cases. 5,748, or slightly less than 13% were filed as bypass continuation applications. *See* Atty. Decl. Ex's. G; G-2; G-3. With the benefit of hindsight, and through the lens of this particular case, Plaintiff claims that filing in the manner it instructed Kenyon to do, which did not make the application eligible for the longer patent term

adjustment changes contained in the AIPA, was malpractice. Pl. Compl. ¶¶17-19.  But the clear and objective facts are that – even leaving aside the fact that Kenyon was following explicit instructions given by Plaintiff's Australian counsel — the standard of care, the course chosen by the overwhelming percentage of attorneys admitted to the bar of the USPTO, who unlike Plaintiff's purported expert, actually filed patent applications, was to file a national stage application. *See* Atty. Decl. Ex's. G; G-2; G-3. That Plaintiff's Australian intellectual property attorney chose this method put him squarely among the 87% of American practitioners who made the same choice. *See id.*

Kenyon was not asked to review the decision of Plaintiff's Australian counsel on how to apply for a United States patent.  *See.* Atty. Decl. Ex. A. at p. 57. Given that this decision was reasonable and in the mainstream of accepted practice, there was no reason to discuss the instruction, or question it.  Plaintiff claims that Kenyon should have discussed the choice of applications directly with Portus. *See* Atty. Decl. Ex. C. at pp. 18-19. Given the fact that Portus was in Australia, that no contact information for the client was provided with the June 15, 2001 fax, that there were two days remaining in the time provided to file the application, or lose it forever, there was no practical way to contact Portus directly, even if that were required. *See* Atty. Decl. Ex. A-14. Further, there is no evidence that such contact was required. The decision to employ the national stage option was not made by Kenyon, but was made by Plaintiff's Australian counsel. *See* Atty. Decl. Ex. A-14. As in the *Ambase* case discussed above, Kenyon was not retained to analyze or advise on options for filing. It was hired specifically to perform a particular legal service. *See* Atty. Decl. Ex. A-14. Plaintiff's attempt to add additional requirements to the scope of the legal services requested must be rejected, as it is contrary to New York law.

13

## C.  The Standard of Care Cannot be Determined by Hindsight

"The perfect vision and wisdom of hindsight is an unreliable test for determining the past existence of legal malpractice." *Darby & Darby, P.*C, 95 N.Y.2d 308 at 315. Furthermore, "[a]…mistake in judgment is not actionable merely because it turns out to be wrong in hindsight, but rather, such a mistake will be actionable as malpractice if it reflects a failure to follow the standard of care." *Kasper v. Damian*, 689 F. Supp. 2d 492, 499 (W.D.N.Y. 2010).  Kenyon had no duty to inform Plaintiff of *possible* alternatives to  the national stage application since it acted "in a manner that was reasonable and consistent with the law as it existed at the time of representation." *Darby & Darby, P.C. v. VSI Intl.*, Inc., 95 N.Y.2d 308 at 315.

Here, Plaintiff's purported "expert" relies solely on hindsight when she opined the standard of care in June, 2001 was to file a bypass continuation application. *See* Atty. Decl. Ex. C. at pp. 21-22; 28-29; 61-62; 64. When the "expert" was asked how she reached this conclusion, she stated:

> Because there was really no downside to doing one…and if they weren't sure, at absolute worst, instead of doing the [national stage] they could have done the [bypass continuation] and the [national stage] at no additional cost; *and then later on figured out which one was going to be more beneficial.*

(*Emphasis added*). *Id*. at p. 24. Plaintiff's "expert" opinion is not based on personal knowledge or objective facts. Instead, her opinion is shaped by looking back in time, and picking the course of action which would have achieved the better outcome. *See id*. at p. 90.  The fundamental error in this analysis is the assumption that the patent was even going to be issued in the first place. No time prior to 2014 was it even probable that the patent was going to issue.  The USPTO examiner consistently rejected the application and the repeated attempts to overcome his objections were futile until 2014.  Plaintiff's expert's suggestion that multiple applications should be filed, along

with the additional expense, makes no sense whatsoever, unless you know the patent was going to issue and there was going to be delay by the USPTO along the way.   This is precisely the type of "hindsight" New York's highest court determined to be unreliable in determining whether malpractice occurred. *Darby & Darby, P.C.* 95 N.Y.2d 308 at 315.

### D. There is No Evidence that a Bypass Continuation Application Should have Been Filed after June, 2001

Plaintiff alleges that "defendant could have mitigated the effects of its mistake by filing a continuation application at any time to the granting of the patent. . . ." *See* Pl. Compl. ¶ 34. This allegation is predicated on the unsupportable allegation that the filing of the national stage application on June 15, 2001 was a "mistake." As discussed above, this act was not a mistake, it was the result of a direction by Plaintiff's Australian counsel, and it was consistent with the standard of practice for attorneys filing applications with the USPTO. *See* Atty. Decl. Ex. A-14; *see also* Atty. Decl. Ex. G-2; G-3. There was nothing about the subsequent prosecution of the national stage application that changed the clear scope of Kenyon's engagement. *See* Atty. Decl. Ex. A-14; *see also* Atty. Decl. Ex. A-15.

In addition, "filing a bypass continuation application [after the 2005 first office action] would have added additional expense and complexity to the prosecution of the application." *See* Atty. Decl. Ex. G. at p. 19. This strategy would not have resulted in a meaningful benefit to Plaintiff since the vast majority of the delay had already occurred by the USPTO's 2005 first office action. *See* Atty. Decl. Ex. G. at pp. 19-20. This allegation should be rejected. Again, it is made with the benefit of hindsight, and is not supported by any competent evidence that Kenyon had a duty to change modify the scope of the engagement set in June, 2001.

i.      **Defendant's August 2014 Petition to Convert the Application to a Bypass Continuation was a modification to the original scope of Kenyon's engagement**

Once it was certain that a  patent was going to be granted, Kenyon attorney, Aaron Grunberger, sent Plaintiff an e-mail that suggested there was an additional legal service that could be provided:

> Hi Tim,
>
> I have been looking into what we can do to get you some extra patent term. **This is a long shot**, but we may be able to file a petition under 37 CFR 181 to convert your application from a "national stage" of the PCT application under 35 USC 371 to a regular U.S. patent application claiming benefit as a continuation of the PCT application under 35 USC111 and 120. If we can get this petition granted, the patent term adjustment rules which went into effect May 29, 2000 would apply to your applications, which potentially can add a significant percentage of term (I have not yet done the calculation). Please let me know if you would want us to continue to look into this course of action. If so, it should be done as soon as possible.

Atty. Decl. Ex. H-1.

Contrary to the allegations in Plaintiff's complaint, the petition to convert the original application was not a last minute attempt to correct a "mistake." Pl. Compl. ¶ 34. Rather, it was a calculated attempt, after the patent had been secured, which was the sole objective of the original retainer, to see if additional patent term could be obtained through expanded legal services. Prior to Mr. Grunberger's e-mail, quoted above, Mr. Lindquist was unsure whether he even wanted Mr. Grunberger to look into the possibility of additional patent term, due to cost. *See* Atty. Decl. Ex. A-75. Specifically, Mr. Lindquist asked Mr. Grunberger how much it would cost for a paralegal to calculate a potential adjustment, and stated: "It's easier to make a decision on this if we can get a better idea of what adjustment we might be entitled to." *Id*. The primary goal of the engagement, obtaining a U.S. patent, had been achieved.  Now, other issues, which would have

been irrelevant without obtaining the patent, could be considered.  The decision to file the petition was one of those issues. It was an addition to and enlargement of the scope of the engagement.

### III.   Plaintiff Did Not Sustain Real and Ascertainable Damages

"Mere speculation about a loss resulting from an attorney's alleged omission is insufficient to sustain a prima facie case of legal malpractice." *Giambrone v. Bank of NY*, 253 A.D.2d 786, 787 (1998). Rather, "plaintiff must prove that it was the attorney's negligence which proximately caused the actual and ascertainable damages that resulted." *Ressis v. Wojick*, 105 A.D.2d 565, 567 (1984). "The threat of future harm, not yet realized, is not enough." *IGEN v. White*, 250 A.D.2d 463, 465 (1998); *see also Douglas v. New York Dep't of Corrections*, 1990 U.S. Dist. LEXIS 7080, at *4 (S.D.N.Y. 1990) ("A plaintiff makes out a claim for prospective damages only if the plaintiff shows that there is a 'reasonable probability' that the harm will occur and that the future harm arises from a cause of action which has already accrued").

In the present case, Plaintiff claims that Kenyon's negligence deprived Plaintiff of over three years of additional patent term during which it would have successfully prosecuted numerous infringement actions and reaped the benefits of that success, in the form of millions of dollars of royalties, licenses, and/or cash payments. *See generally* Pl. Compl.  Courts have long recognized that damages for patent infringement which are merely speculative will not be awarded.  *See Power Specialty Co. v. Connecticut Light & Power Co.*, 80 F.2d 874, 875 (2d Cir. 1936) (citations omitted) ("What a patentee would have made had not the infringer interfered with his right to his patent monopoly is, not what speculatively he may have lost, but what he actually did lose.…What one claiming infringement would have made if an infringer had not made the sales cannot be left to inference, conjecture, or speculation.…The holder of the patent

must show that he would have made the sales if the infringer had not….").  This analysis applies even more forcefully to a so called non practicing entity, such as Plaintiff.  The damages alleged constitute pure speculation.

In four and one half years that Plaintiff has held its U.S. patent, and in the nearly twenty years it has held its Australian patent, Plaintiff's expert admits that not even one product anywhere has been found to infringe any of Plaintiff's patents. *See* Atty. Decl. Ex. B. at pp. 32-33.  Plaintiff's claim is that the extra three plus years of patent term would have almost magically lead to successful enforcement actions and tens of millions of dollars of revenue.

In *IGEN, Inc. v. White*, 250 A.D.2d 463, 672 N.Y.S.2d 867 (1st Dep't 1998) the plaintiff alleged that his attorney failed to file a patent application on its behalf in Europe before the deadline, and also failed to advise plaintiff of the consequences of not filing the application, resulting in "the abandonment of all patent rights … in those countries recognizing the European Patent Office." The complaint asserted that plaintiff had been "informed that the aforesaid patent was likely to be extremely valuable in the future" and sought damages in the amount of $150,000,000.

The New York Appellate Division was understandably skeptical of the $150,000,000 valuation since (like Portus in the present case) *IGEN's* patented process had not been demonstrated to have any commercial value. As in the present case, *IGEN's* expert opined that, while commercial products were still in the research and development stage, their commercial value would have been realized in the next five to ten years. *IGEN* asserted basis for recovery was that, had it obtained its desired patents, it would have been able to reap anticipated royalties. The court rejected this argument. *See id*., 250 A.D.2d at 464-66 (citations omitted):

> What plaintiff's argument overlooks is that it has sustained no injury
> unless there has been an infringement against which its patent would have

afforded a right of recovery (35 USC § 271 [a]….Moreover, given the lack of any present commercial value, plaintiff's expert's conclusion concerning the eventual value of its process is no more than idle speculation (*Trademark Research Corp. v. Maxwell Online*, 995 F2d 326, 333 [2d Cir. 1993] [neither historical basis nor competitor's experience available to substantiate claimed damages]….

While conceding in its moving papers, submitted in 1996, that its patent presently lacked any commercial value, plaintiff nevertheless seeks to recover from defendants the amount its process might be worth by the year 2004 or 2009 on the basis of an act of attorney malpractice alleged to have been committed in 1985.   The magnitude of the sum sought to be recovered in this litigation is apparently exceeded only by the duration by which plaintiff would protract the Statute of Limitations for recovery in negligence against an attorney.

…Plaintiff's briefs are devoted to the contention that it should be permitted to establish the amount of future damages upon trial.  Plaintiff does not contend that any actual harm had been sustained as of the date its action was commenced and none can be discerned from the record.  In the nearly 13 years since the date of the alleged malpractice and seven years since the filing of the complaint, plaintiff can point to no actual damage that has been incurred.

Accordingly, an essential element of the tort of negligence is lacking, and the complaint must be dismissed for failure to state a cause of action.

In *Collard & Roe, P.C. v. Vlacancich* the plaintiff law firm brought a breach of contract and account stated action for legal services rendered in connection with drafting an application for a patent, and the defendant client counterclaimed for legal malpractice. 6 Misc. 3d 17, 789 N.Y.S.2d 599 (2d Dep't 2004). The client claimed that, as a result of plaintiff's failure to correct the patent application which it drafted, and to timely file a patent application, he sustained damages including lost profits and monies that he would have received from investors who backed out after the long delay.  The court had little difficulty determining that, inasmuch as the damages claimed by defendant were neither actual nor ascertainable and were speculative in nature, he failed to establish a *prima facie* case of legal malpractice.

So too in this case, Plaintiff relies upon an analysis of an expert who ignores the fact that the Plaintiff's patent was issued in 2003 in Australia, and yet there has been no determination that the patent was infringed in that country over the succeeding 16 years. *See* Atty. Decl. Ex. B. at pp. 19; 23; 29; 32-33; 87. Similarly, the U.S. patent was issued over 4.5 years ago, and there has been no determination of infringement. *See* Atty. Decl. Ex. B. at pp. 32-33.  Moreover, the damages analysis is based upon the unsupported opinions of Plaintiff's representative in this case, Timothy Lindquist, that every single product sold in the "Smart Home market" in the United States infringes on Plaintiff's patent. *See* Atty. Decl. Ex. B. at pp. 19-20.  Although he cannot name the companies, or even say how many there are, he takes billions of dollars of revenue and uses that as  a starting point for his analysis that an extra three years of patent years would have resulted in between $9 million and $30.5 million dollars in revenue to Plaintiff. *See* Atty. Decl. Ex. B. at pp. 35-37. These damages and royalties are going to secured from major international companies who were not interested in paying even $50,000 for complete access to all of Plaintiff's patents.  This incredibly broad range of over $20 million between the high and low figures, without more, strongly suggests that these damages are the result of guesswork, and are not "real and ascertainable."  They are rather imaginary and speculative.

## CONCLUSION

For the reasons set forth above and in the accompanying submissions, it is respectfully requested that the Court issue an Order dismissing Portus' Amended Complaint in its entirety, along with granting such other relief as is just and proper.

**Dated**:  August 22, 2019                    **BARCLAY DAMON LLP**


By:   s/Dennis R. McCoy
        Dennis R. McCoy

*Attorneys for Defendant*
*Kenyon & Kenyon LLP*
Office and Post Office Address
The Avant Building
200 Delaware Avenue
Buffalo, New York  14202
Telephone: (716) 566-1300
E-mail address:dmccoy@barclaydamon.com

## <u>CERTIFICATION</u>

As required by Rule 2(D) of the Individual Practices Of Judge John G. Koeltl, I certify that the document contains 6,547 words, excluding the parts of the document that are exempted by Rule 2 (D).  I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 22, 2019               **BARCLAY DAMON LLP**

By: _____*/s Dennis R. McCoy*_____
              Dennis R. McCoy, Esq.

*Attorneys for Defendant*
*Kenyon & Kenyon, LLP*
Office and Post Office Address
The Avant Building
200 Delaware Avenue
Buffalo, New York  14202
Telephone: (716) 566-1300
E-mail address:dmccoy@barclaydamon.com

22