**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————

**PORTUS SINGAPORE PTE LTD,**

                **Plaintiff,**         **16cv6865 (JGK)**

      **- against -**            <u>**OPINION & ORDER**</u>

**KENYON & KENYON LLP,**

                **Defendant.**
————————————————————————————

**JOHN G. KOELTL, District Judge:**

Portus Singapore PTE LTD ("Portus") filed this lawsuit against Kenyon & Kenyon LLP ("Kenyon") for legal malpractice under New York State law in connection with Kenyon's representation of Portus in prosecuting a patent application before the United States Patent and Trademark Office ("USPTO") on behalf of Portus. Portus's patent will expire on June 7, 2020 and Portus alleges that, but for Kenyon's negligence, the patent would have expired on December 29, 2023. Portus argues that Kenyon's negligence proximately caused damages equal to the "lost" three-and-a-half year patent term. Kenyon now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 and also moves to strike the reports and testimony of two of Portus's experts, Clare Cox, its liability expert, and Justin Lewis, Portus's damages expert. Portus moves to strike part of the report and testimony of Kenyon's expert, Robert Stoll.

1

For the reasons that follow, Kenyon's motion to strike the testimony and report of Portus's experts is **granted in part** and **denied in part**. Portus's motion to strike part of Kenyon's expert's report and testimony is **denied**. Kenyon's motion for summary judgment is **granted**.

## I.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts

which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir. 1998).

## II.

The following facts are undisputed unless otherwise noted.

3

Portus Pty Ltd. is an Australian business entity formed in 1998. Def. 56.1 Stmt. ¶ 5.[1] On December 17, 1998, Portus Pty Ltd., through its Australian patent counsel, Peter Treloar, filed an Australian patent application for an invention, originally conceived of by brothers Timothy and Cameron Lindquist, that would allow a remote user to connect to his or her home through a web browser in order to view, monitor, and control devices within the home, such as security cameras. Id. at ¶¶ 8, 9, 12. At all relevant times, Mr. Treloar was Portus's counsel for intellectual property matters in Australia. Id. at ¶ 10.

On December 17, 1999, Portus filed an international application under the Patent Cooperation Treaty ("PCT"), which allowed Portus to apply for patents in, among other jurisdictions, the United States and the European Union. Def. 56.1 Stmt. ¶¶ 13-14; Mem. Opp., Ex. M. On June 15, 2001, Mr. Treloar sent Kenyon, a law firm located in the State of New York, a 43-page fax, the cover page of which stated:

> Please proceed to enter the National Phase in the United States on behalf of our client and in accordance with the details shown on the attached sheet. We request you file this application by 17 June 2001 and forward your report and invoice in due

---

[1] In 2002, the plaintiff, Portus Singapore LTE, was formed and in 2003 it became the parent entity to Portus Pty Ltd. Def. 56.1 Stmt. ¶ 6. The company is referred to as "Portus" throughout this opinion for ease of reference.

> course. All charges for late filing of documents
> should be included in your initial invoice. If there
> are any documents requiring the execution of the
> inventors or the applicant, please prepare and forward
> such documents to us. In the absence of our specific
> instructions please keep this application in force.
> Kindly acknowledge receipt of these instructions by
> facsimile immediately upon receipt.

Pl. 56.1 Stmt. ¶ 16; McCoy Decl., Ex. A-14. The heading of the

letter stated: "**URGENT – DUE DATE: 17 June 2001.**" McCoy Decl.,

Ex. A-14. The 43-page fax was the sole communication in 2001

from Mr. Treloar to Kenyon pertaining to the request to file a

patent application in the United States. Id. at ¶¶ 18-19.

According to Timothy Lindquist's undisputed deposition

testimony, although Portus was aware that Mr. Treloar might

retain lawyers to pursue patent protection in jurisdictions

outside Australia, Portus was not directly involved in retaining

Kenyon. Id. at ¶¶ 21-23; McCoy Decl., Ex. A, at 56-57.

The same day, on June 15, 2001, Dervis Magistre, an

associate attorney working for Kenyon, filed a patent

application with the USPTO pursuant to 35 U.S.C. § 371 for

"Local and Remote Monitoring Using a Standard Web Browser." Def.

56.1 Stmt. ¶ 24; McCoy Decl., Ex. A-15.[2] On June 19, 2001, Mr.

---

[2] A "national stage" application under 35 U.S.C. § 371 is one means by which a
United States application can be filed in connection with an international
application under the PCT. A continuation bypass application filed under 35
U.S.C. § 111 is another means of filing a United States patent application in
connection with an international application under the PCT. Although there

Magistre wrote to Mr. Treloar confirming that "[w]e have entered
the National Phase in the United States with respect to the
above-reference PCT application." Pl. 56.1 Stmt. ¶ 25; McCoy
Decl., Ex. A-15. Also on June 19, 2001, James Rosini, an
attorney for Kenyon, signed and sent to Portus a letter titled
"Legal Representation for PORTUS PTY LIMITED." McCoy Decl., Ex.
E-4. The letter set out Kenyon's billing policies, discussed
insurance matters, and stated, among other things, that Kenyon
"practices only intellectual property law" and are "U.S.
counsel, and that while we may sometimes provide informal

---

are many technical differences between the two, for purposes of this case the
relevant differences concern the ways the two applications relate to the
American Inventors Protection Act of 1999 ("AIPA"). The AIPA was enacted on
November 29, 1999. Among other things, the Act provides that a patent term
can be adjusted beyond the usual twenty-year patent term, as measured from
the date of filing the patent application, based on delays in granting the
application that are due to the failures of the USPTO. 35 U.S.C. § 154(b).
Under the AIPA, patents issued on applications filed on or after the
effective date of May 29, 2000 are eligible for a patent term adjustment if
there was more than a three-year delay in issuing a patent from the date the
application was filed under 35 U.S.C. § 111 or 35 U.S.C. § 371 until the date
the USPTO acts with respect to the application. 37 C.F.R. § 1.702(b); 37
C.F.R. § 1.703(b) (describing the method of calculating adjustment periods
for applications filed under 35 U.S.C. § 111 or 35 U.S.C. § 371). The delay
does not include time spent, among other things, by the USPTO examining the
patent after a notice of rejection. 37 C.F.R. § 1.702(b)(1). See n.5 infra. A
35 U.S.C. § 371 application filed after May 29, 2000 that is the national
stage of a PCT application that predates May 29, 2000, as is the case here,
will not be able to take advantage of the AIPA patent term adjustment because
the filing date of the patent filed under 35 U.S.C. § 371 will be the date of
the PCT application. MPEP § 1893.03; 35 U.S.C. § 363. A 35 U.S.C. § 111
application filed after May 29, 2000 that is a continuation of an
international patent under 35 U.S.C. § 120 will have a filing date based on
the date the bypass continuation application is filed with the USPTO. 37
C.F.R. § 1.53(b).

general advice regarding intellectual property protection in
other countries, we and you must both rely on the advice and
opinions of practitioners in those other countries for legal
advice." Id.[3]

After Kenyon filed the Section 371 application in June
2001, the USPTO did not act on the application until January 19,
2005, more than three years after the application was filed in
June 2001, at which point Kenyon received a non-final office
action with respect to the patent application. Stoll Rpt. (McCoy
Decl., Ex. G-2) at 18. Following the non-final action, Kenyon
continued to prosecute the patent by responding to the non-final
office action. Id. In 2006, there a final office action issued

---

[3] At oral argument, counsel for the plaintiff stated that this letter never
reached Portus. There is no evidence in the record that the Rosini letter did
in fact reach Portus or any of Portus's representatives.

from the USPTO. Id.[4] Following these rejections, Kenyon continued

to prosecute the patent application.[5]

Eventually, in August 2014, it became apparent to Kenyon

that the USPTO was going to issue Portus its United States

Patent. Id. at ¶ 35. On August 12, 2014, Timothy Lindquist, then

a representative of Portus, received the following email from a

Kenyon attorney, Aaron Grunberger:

> Hi Tim,
> I have been looking into what we can do to get you
> some extra patent term. This is a long shot, but we
> may be able to file a petition under 37 CFR 181 to
> convert your application from a 'national stage' of
> the PCT under 35 USC 371 to a regular U.S. patent
> application claiming benefit as a continuation of the
> PCT application under 35 USC 111 and 120. If we can

[4] "A **nonfinal** office action raises a legal problem about your application for
the first time. You must respond to this letter within six months from the
date it issues. If your response satisfied each legal problem in the nonfinal
office action and doesn't raise any new problems, your application will
proceed toward registration. If your response doesn't satisfy each problem
and doesn't raise any new problems, you will be sent a final office
action. . . A **final** office action raises a legal problem about your
application for the last time. . . When you receive a final office action,
it's your last opportunity to file a response during the application process.
If your response satisfied each legal problem in the final office action,
your application will proceed toward registration." Responding to office
actions, https://www.uspto.gov/trademarks-maintaining-trademark-
registration/responding-office-actions (last accessed, Feb. 21, 2020).

[5] The time following the initial non-final rejection until the issuance of the
patent in this case would not qualify as delay caused by the USPTO that could
be added to the patent term as an adjustment under the AIPA because that re-
examination was carried out pursuant to 35 U.S.C. § 132(b). That time is
excluded from calculating the patent term adjustment under the AIPA. 37
C.F.R. § 1.702(b)(1). Thus, only the time from the application in June 2001
until the non-final rejection on January 10, 2005 would constitute the delay
caused by the USPTO that could be tacked on to the end of the patent term
under the AIPA in this case.

> get this petition granted, the patent term adjustment
> rules which went into effect May 29, 2000 would apply
> to your application, which potentially can add a
> significant percentage of term (I have not yet done
> the calculation). Please let me know if you would like
> us to continue to look into this course of action. If
> so, it should be done as soon as possible.

Id. at ¶ 36; Colbert Decl., Ex. H-1 (McCoy Decl., Ex. H).
Following the email of August 12, 2014, there were further
communications between Portus and Kenyon discussing the
possibility of filing a petition to convert the original patent
application from an application filed under 35 U.S.C. § 371 to
an application filed under 35 U.S.C. § 111, as well as the basis
for the petition, its chances of success, what it might achieve
for Portus, and the costs associated with such a petition. Pl.
56.1 Stmt. ¶ 37; McCoy Decl., Ex. A-75. In one of these
communications, Grunberger stated to Lindquist that he thought
an additional three-and-a-half years of patent term could be
obtained if the petition was granted by providing the patent
with a patent term adjustment under the AIPA. McCoy Decl., Ex.
A-75; Mem. Opp., Ex. D-8.

On August 29, 2014, acting on Portus's authorization,
Kenyon filed a petition with the USPTO attempting to convert the
national stage application filed in June 2001 into a bypass
continuation application. Pl. 56.1 Stmt. ¶¶ 38-39.

On September 18, 2014, the USPTO denied the petition to convert the Section 371 application into a Section 111 application. Pl. 56.1 Stmt. ¶ 40; Mem. Opp., Ex. L, at 3. The USPTO noted that the patent statutes and regulations do not specifically provide for a conversion from a Section 371 application to a Section 111 application, and therefore such a petition would be granted only on a showing of "sufficient cause, e.g. the loss of the right to obtain a patent on the claimed subject matter, where no other remedy is available." Mem. Opp., Ex. L, at 2. The USPTO found that Kenyon had not demonstrated sufficient cause in the petition that Kenyon prepared because the "applicant's right to obtain a patent on the claimed subject matter has not been foreclosed" and the "applicant had the ability to file a continuing application [under 35 U.S.C. § 111] claiming benefit of the international application, which would have secured the desired patent term adjustment rights." Id. at 3. The USPTO noted that the "applicant's own failure to avail himself of this option cannot reasonably be considered grounds for relief," and that such a request to convert "should have been made within a reasonable time after the mailing of the non-final rejection on 10 January 2005" instead of the "more than nine years after applicant was aware of a potential patent term adjustment issue." Id.

On December 16, 2014, the USPTO issued Portus a United States Patent for its invention, US Patent 8,914,526 B1 (the "'526 patent"), as a national stage patent under 35 U.S.C. § 371. Pl. 56.1 Stmt. ¶ 41; Mem. Opp., Ex. J-3. When the patent was issued, 173 days of additional patent term was granted by the USPTO, based on an adjustment available to patent applications with a filing date prior to the effective date of the AIPA, thus giving the '526 patent an expiration date of June 7, 2020. Pl. 56.1 Stmt. ¶¶ 42-43.

Portus's Australian patent application, which had been pending since 1998, was granted in 2003. Id. at ¶ 27; McCoy Decl., Ex. A, at 84. From the time the Australian patent was granted, Portus has neither brought an action to enforce its patent rights in Australia, nor entered into any licensing agreements for its patent. Pl. 56.1 Stmt. ¶¶ 30-31. Portus later found an investor in Singapore through a government-run program and engaged in commercialization trials and joint development programs. Id. at ¶ 32. The engagements were not substantial enough to allow Portus to begin large-scale commercial production of its invention patented in Australia, which required several hundred thousand dollars. Id. at ¶ 33. In 2012, Portus decided to abandon its attempts to commercialize its

invention through production and instead decided to focus on "monetizing" its intellectual property. Id. at ¶ 34.

In 2015, Portus engaged a law firm to monetize the '526 patent through license sales and enforcement actions. Id. at ¶ 49. In 2016, Portus received $150,000 for the sale of three sub-licenses for use of the '526 patent to Apple, Comcast, and Cisco. Id. at ¶ 47. After the issuance of the United States Patent, Kenyon declined to represent Portus in an enforcement campaign on a contingent fee basis. Id. at ¶ 51. Through its retained United States patent enforcement counsel, Portus has now instituted four enforcement actions in United States courts, one of which resulted in a $100,000 infringement settlement with Zmodo with additional money to be paid to Portus in the event that additional infringing revenue beyond $5 million was identified before the expiration of the '526 patent. Id. at ¶¶ 47, 53. The other three enforcement actions were pending at the time this motion was filed. Id. at ¶ 53.[6]

On August 31, 2016, Portus filed this legal malpractice suit under New York law against Kenyon, properly invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332. Portus

---

[6] Subsequent to oral argument, Portus notified the Court that it has settled the remaining three enforcement actions with SimpliSafe, Vivint, and AT&T Digital Life. Dkt. Nos. 155, 156. Counsel for the plaintiff represented that the total sum of money to be paid to Portus from the four settlement agreements totals $510,000. Dkt. No. 155.

contends that Kenyon's professional negligence resulted in a loss of three-and-a-half years of patent term for the '526 patent. Instead of expiring on June 7, 2020, it would have expired on December 29, 2023 had Kenyon done what Portus alleges was required by the standard of care owed by lawyers to their clients, namely advising Portus of its options prior to filing the patent application on June 17, 2001 or filing a bypass continuation application pursuant to 35 U.S.C. § 111 in 2001 to obtain the benefit of the additional patent term under the AIPA.

### III.

To succeed on a claim for legal malpractice in New York, a plaintiff must prove three elements: "(1) that defendant was negligent; (2) that defendant's negligence was the proximate cause of the claimed injury; and (3) that plaintiff suffered actual and ascertainable damages." Diamond v. Sokol, 468 F. Supp. 2d 626, 632 (S.D.N.Y. 2006) (quotation marks and citation omitted). Kenyon argues that no reasonable juror could find that Portus has proved the first and third elements of legal malpractice. Kenyon is correct.

### A.

### 1.

In order to demonstrate that a lawyer was negligent "a plaintiff must show that an attorney failed to exercise the

ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" and that "the attorney's breach of this professional duty caused the plaintiff's actual damages." McCoy v. Feinman, 785 N.E.2d 714, 718-19 (N.Y. 2002) (internal quotation marks and citations omitted). "What constitutes ordinary and reasonable skill and knowledge cannot be fixed with precision, but should be measured at the time of representation." Darby & Darby, P.C. v. VSI Intern., Inc., 739 N.E.2d 744, 747 (N.Y. 2000). Generally, "ordinary and reasonable skill" is determined by looking to standards of legal practice in the State of New York. See, e.g., Sokol, 468 F. Supp. 2d at 637 (discussing New York law practice commentary). Moreover, "[a]n attorney may not be held liable for failing to act outside the scope of a retainer." Attallah v. Milbank, Tweed, Hadley & McCloy, LLP, 93 N.Y.S.3d 353, 356 (App. Div. 2019).

In AmBase Corp. v. Davis Polk & Wardwell, 866 N.E.2d 1033, 1035 (N.Y. 2007), following the liquidation of its parent company, the plaintiff corporation AmBase assumed primary liability for the parent corporation's federal income taxes and secondary liability for all other liabilities. Following liquidation, the Internal Revenue Service ("IRS") found the parent company liable for six years' worth of withholding taxes, which would be imputed to AmBase under the liquidation

agreement. Id. AmBase retained Davis Polk "to represent [it] as
agent for [the parent corporation] to resolve the tax issues
currently before" the IRS. Id. at 1037. Davis Polk then
successfully challenged in the Tax Court the IRS's determination
that AmBase was liable. Id. at 1035. AmBase then turned around
and sued Davis Polk for legal malpractice on the ground that
Davis Polk had failed to advise AmBase that AmBase was only
secondarily liable for payment of taxes. Id. AmBase alleged that
although it ultimately prevailed in the Tax Court, Davis Polk's
negligence forced AmBase to maintain a multi-million-dollar loss
on its books, thereby creating an appearance of insolvency that
resulted in lost business opportunities. Id. at 1036.

The New York Court of Appeals noted that the plain language
of the retainer agreement "indicates that Davis Polk was
retained to litigate the amount of tax liability and not to
determine whether the tax liability could be allocated to
another entity." Id. at 1037. Noting that "the issue whether
plaintiff was primarily or secondarily liable for the subject
tax liability was outside the scope of its representation," the
court held that the "defendants exercised the ordinary
reasonable skill and knowledge commonly possessed by a member of
the legal profession when they focused their efforts on the
controversy between AmBase and the IRS – the subject of the

retainer agreement – resulting in a most favorable outcome, which was publicly praised by AmBase principals." Id.

Similarly, in Milbank, Tweed, the law firm agreed in its engagement letter to represent the plaintiff "to investigate and consider options that may be available to urge administrative reconsideration" of the plaintiff's expulsion from the New York College of Osteopathic Medicine. 93 N.Y.S.3d at 355. The Appellate Division of the Supreme Court affirmed the dismissal of the plaintiff's complaint that had alleged malpractice on the ground that Milbank, Tweed did not actually negotiate the plaintiff's readmission to the school. Id. at 356. The court reasoned that an attorney cannot be held liable for failing to act outside the scope of a retainer and that negotiation with the school went beyond the stated scope of the agreement letter. Id.

Davis Polk and Milbank, Tweed stand for the proposition that the failure by a lawyer to take actions outside the scope of that lawyer's representation of a client cannot form the basis of a legal malpractice suit.

This case is substantially similar to Davis Polk and Milbank, Tweed. The parties do not point to any formal retainer or contract that spelled out the engagement between Kenyon and Portus. Rather, the "scope" of the engagement between Portus and

Kenyon was set out in the communications between Kenyon and Portus's agent, Mr. Treloar. Mr. Treloar's communication, faxed to Kenyon on June 15, 2001, instructed Kenyon "to enter the National Phase in United States on behalf of our client and in accordance with the details shown on the attached sheet." McCoy Decl., Ex. A-14.[7] Mr. Treloar instructed Kenyon to file the application by June 17, 2001 and alerted Kenyon that this due date was "**URGENT**." Id. Mr. Treloar further stated that "[i]n the absence of our specific instructions please keep this application in force." Id. (emphasis added).

The scope of Kenyon's initial engagement in 2001 was thus limited to the narrow task of "enter[ing] the National Phase in United States" of the international patent application and to keep the application in place absent further instructions from Portus.[8] Acting on these instructions, Kenyon then filed an

---

[7] At oral argument of the present motions, Portus stated that the phrase "national phase" is vague. However, Portus acknowledged that a "national phase" could not, in any event, refer to an application made under 35 U.S.C. § 111 and that the direction to enter the "national phase" was most reasonably interpreted as a direction to file an application under 35 U.S.C. § 371. Tr. at 21.

[8] At oral argument, counsel for the plaintiff suggested that the Rosini letter, although it was never received by Portus, is nevertheless instructive on the scope of representation between the parties. Namely, plaintiff's counsel argued that by acknowledging that Kenyon was United States patent counsel and therefore unable to consult on non-United States patent matters, Kenyon was implicitly noting that its role in advising Mr. Treloar on United States patent matters encompassed giving advice possibly outside the scope suggested by the narrower direction to enter the "national phase" of Portus's international patent. Portus's argument stretches the meaning of the Rosini

application for the national stage of the international patent application under 35 U.S.C. § 371 on that same day, June 15, 2001, two days before the deadline to file an application with the USPTO in connection with Portus's international patent.

Portus's claim of malpractice against Kenyon fails because Kenyon did exactly what it was required to do in its engagement: Kenyon filed an application pursuant to 35 U.S.C. § 371 within two days and Kenyon kept the application in force and prosecuted the application until it was granted in December 2014.

Portus argues that Kenyon committed malpractice because Kenyon failed to advise Portus in June 2001 that Portus would benefit if Kenyon filed an application under 35 U.S.C. § 111 rather than under 35 U.S.C. § 371 in the event that the USPTO extensively delayed consideration of the application by more than three years. If such a delay occurred, Portus would then be eligible for a patent term adjustment under the AIPA. However, this advantage was entirely speculative and dependent on the subsequent extensive delay by the USPTO of more than three years between the filing of the application in June 2001 and the initial non-final action in January 2005. Nevertheless, Portus claims that Kenyon's failure to advise Portus of the possible

---

letter beyond its natural meaning and the letter does nothing to displace or modify the scope of the engagement as expressed in Mr. Treloar's letter to Kenyon on June 15, 2001.

advantage of a 35 U.S.C. § 111 filing in June 2001 was
malpractice.

The only advantage that Portus points to from filing a 35
U.S.C. § 111 application rather than a 35 U.S.C. § 371
application in June 2001 is the extended patent term if the
USPTO delayed in approving the patent application by more than
three years. But that advantage was entirely theoretical in June
2001 before any application had been filed. Portus points to no
comparable case where an attorney was required to go beyond the
limits of an engagement and advise a client about theoretical
advantages of another course of action that were based on
unknown future contingencies.

Portus's argument fails because there was nothing about the
June 2001 engagement that required Kenyon to advise Portus about
the theoretical advantages of another application, advantages
that would accrue to Portus only in the event, which was
entirely speculative in June 2001, that the USPTO delayed
consideration of the patent application by more than three
years. While it is true that a lawyer can be held liable for
withholding facts that are "relevant to the client's decision to
pursue a given course of action," Spector v. Mermelstein, 361 F.
Supp. 30, 39-40 (S.D.N.Y. 1972), aff'd, 483 F.2d 474 (2d Cir.
1973), it is also true that "an attorney is not held to a

standard of 'infallibility' and the 'perfect vision of hindsight' is an unreliable test for determining the past existence of legal malpractice." Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP, 889 N.Y.S.2d 506(Table), at *11 (Sup. Ct. 2009) (internal citations omitted).

Kenyon carried out its representation of Portus as requested by Portus and successfully prosecuted the patent after the non-final and final action by the USPTO until the USPTO eventually granted Portus a patent in December 2014. Just as in Davis Polk and Milbank, Tweed, the scope of the agreement between the parties in this case did not impose upon the defendant an obligation to advise the plaintiff about matters outside the scope of that representation. In particular, Kenyon had no free-standing obligation separate and apart from the scope of the engagement to advise Portus about the drawbacks and advantages associated with a continuation bypass application and a national stage application in June 2001 when Portus retained Kenyon. Portus retained Kenyon for the very narrow purpose of entering the national phase in the United States of Portus's international application and keeping that application in force until instructed otherwise. See Davis Polk, 866 N.E.2d at 1037 ("Thus, the issue whether plaintiff was primarily or secondarily

liable for the subject tax liability was outside the scope of its representation.").

The cases that Portus cites in support of its contention that Kenyon was negligent in failing to advise Portus adequately after being contacted on June 15, 2001 prior to filing a patent application with the USPTO are inapposite.

In French v. Hogan, 619 N.Y.S.2d 406, 407 (App. Div. 1994), the plaintiff had entered into a contract to purchase a residence and employed the defendant attorney to represent her in connection with the transaction. In affirming the denial of summary judgment to the defendant, the court noted that "there remains an unresolved factual issue as to whether, if timely advised of the existence of the restrictive covenant, plaintiff could have avoided at least a significant portion of her alleged damages" incurred when she converted the property from a residence to a bed and breakfast following her purchase. Id.

In French, the plaintiff did not receive everything that she sought under the engagement with her attorney because the building she purchased had a covenant preventing her from putting the building towards her intended use. In this case, unlike in French, it is undisputed that Portus received what it requested of Kenyon in June 2001, namely that Kenyon enter the national phase of Portus's application by filing an application

under 35 U.S.C. § 371 and that Kenyon keep the application in place unless Portus told Kenyon to do otherwise. Kenyon performed as requested, leading to the successful prosecution of the patent application when it was granted in December 2014.

In the other case cited by Portus, Estate of Nevelson v. Carro, Spanbock, Kaster & Cuiffo, 686 N.Y.S.2d 404 (App. Div. 1999), the plaintiff corporation Sculptotek was created upon the advice of the defendant lawyer for the purposes of organizing the financial affairs of a famous sculptor, Louise Nevelson. After Nevelson's death, the IRS determined that the corporation was a sham entity and that the corporate assets should be part of the sculptor's estate. The determination was based in part on the lack of compensation to Nevelson for her artwork. The Appellate Division found that the attorney could be liable for malpractice for failing to advise their clients of the adverse consequences under the plan they recommended.

In Nevelson, the defendants failed to advise the plaintiffs on a central aspect of the plan that the defendants were retained to implement, namely the construction of a corporate structure that would survive an IRS audit. In this case, unlike in Nevelson, Kenyon did everything that Portus asked it to do in June 2001.

Rather, this case is governed by <u>Davis Polk</u> and <u>Milbank, Tweed</u>, not by <u>French</u> and <u>Nevelson,</u> on the question whether Kenyon was required to advise Portus about possible advantages and disadvantages of the agreement between the parties in June 2001. In this case, as in <u>Davis Polk</u> and <u>Milbank, Tweed</u>, there is no negligence when a lawyer performs under an agreement but fails to advise the client on a matter that falls outside the scope of the agreement, when the client received what it contracted to receive as spelled out in the engagement.

On the undisputed facts of this case, no reasonable juror could conclude that Kenyon was negligent when it failed to advise Portus in June 2001 about the advantages and drawbacks associated with filing a patent application under 35 U.S.C. § 111 and 35 U.S.C. § 371 when the engagement between Portus and Kenyon was limited to Kenyon's entering the "national stage" of Portus's international patent, which Portus agrees is most reasonably interpreted as filing an application under 35 U.S.C. § 371.

**2.**

With respect to Portus's second theory of negligence, Portus has failed to show that Kenyon acted negligently when it filed a 35 U.S.C. § 371 application on behalf of Portus in June 2001 rather than a 35 U.S.C. § 111 application because no

23

reasonable juror could find that Portus failed to exercise the ordinary reasonable skill of a New York lawyer filing a patent application in June 2001.

In 2001, the most commonly used method of filing a patent with the USPTO related to an international patent application was a national stage application under 35 U.S.C. § 371. As reported by Kenyon's expert, Robert Stoll, a former Commissioner of Patents with the USPTO, statistics generated by the USPTO indicate that of the patent applications filed on or after May 29, 2000 related to an international application filed before May 29, 2000, 38,529, or a little over 87%, were filed as national stage applications while 5,748, or a little less than 13% were filed as bypass continuation applications.[9] McCoy Decl.,

---

[9] In its motion to strike part of the defendant's expert testimony, Portus objects to the use of these statistics, which were obtained from the USPTO by Stoll in a Freedom of Information Act ("FOIA") request made on June 11, 2019. Portus objects that the statistics are allegedly unreliable and inadmissible hearsay. Portus's argument fails for several reasons. First, the statistics were obtained through a FOIA request from a public office, the USPTO, and are therefore admissible under Federal Rule of Evidence 803(8), an exception to the hearsay rule for public records. See Wye Oak Tech., Inc. v. Republic of Iraq, No. 10-cv-1182, 2019 WL 4044046, at *15 n.8 (D.D.C. Aug. 27, 2019). Portus has not carried its burden, as the party opposing admissibility under Rule 803(8), of showing that the statistics generated by the USPTO and the email sent to Stoll were not trustworthy. See Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (discussing then-Rule 803(8)(C)). Portus's allegation that the statistics are untrustworthy simply because the USPTO worker who prepared the statistics at one time worked for Stoll is entirely unsubstantiated. Second, Stoll was entitled to rely on the data to come to the expert conclusion that "the filing of a national stage application for the Portus Australian patent on June 15, 2001 was consistent with good and accepted professional practice for patent prosecutors admitted to practice before the USPTO in June, 2001." McCoy Decl., Ex. G, ¶ 12. Fed. R. Evid. 703;

24

Ex. G-3. Moreover, national stage applications filed under 35 U.S.C. § 371 have reduced filing fees and more streamlined application procedures as compared to bypass continuation applications filed under 35 U.S.C. § 111. For example, there is no need to refile documents with the PTO that have been filed in accordance with the PCT when filing an application under 35 U.S.C. § 371. Stoll Rpt. at 13-14. Additionally, the primary benefit of a bypass continuation application identified in this case by Portus – the possibility of availing itself of the patent term adjustment provisions in the AIPA – would not have been immediately foreseeable to Kenyon at the time because "[n]o one can anticipate the delay caused by the USPTO when filing an application." Id. at 15. As Stoll's report makes clear, term adjustment protections are but one of many factors to be considered by an applicant when choosing to file either a national stage application or a continuation bypass application. Id. As Stoll stated in his report, "[t]he standard of care for a reasonable patent prosecutor practicing before the USPTO in [2000 to 2002] was to file a national stage application rather than a bypass continuation application." Id. For these reasons,

---

Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94-95 (2d Cir. 2000) (per curiam). The motion to strike that portion of Stoll's expert testimony is **denied.**

Kenyon's actions were objectively reasonable from the vantage point of June 2001.

Portus's reliance on the 2014 USPTO opinion denying Kenyon's petition to convert the patent application into a bypass continuation application to demonstrate that Kenyon should have filed an application under 35 U.S.C. § 111 in June 2001 is misplaced. The USPTO correctly stated in the opinion denying the petition to convert in 2014 that filing a Section 111 application in 2001 "would have secured the desired patent term adjustment rights." Mem. Opp. Ex. L, at 3. But the question under New York law is not whether, with the benefit of hindsight, filing a Section 111 may have generated a more preferable outcome for Portus. See Sklover & Donath, LLC v. Eber-Scmid, 897 N.Y.S.2d 62, 63 (App. Div. 2010) (dismissing a claim for legal malpractice when "[t]he allegations that plaintiff's decisions were unreasonable are based on hindsight"). It is irrelevant in this case that the USPTO stated in 2014 that Kenyon could have acted differently in 2001 because the USPTO made that statement solely with the benefit of hindsight, knowing that there had been a multi-year delay from 2001 until the non-final office action in January 2005, and the USPTO did not purport to suggest that the course of action taken by Kenyon in June 2001 was unreasonable when considered in the

26

context of the circumstances as they were known to Portus and Kenyon in June 2001.

   In opposing summary judgment and arguing that Kenyon was negligent in not filing an application under 35 U.S.C. § 111 in June 2001, Portus offers the expert testimony of Clare Cox.[10] Cox's testimony is, in substance, that "given the drastic AIPA

---

[10] Kenyon moves to strike Cox's expert testimony under Federal Rule of Evidence 702 because she lacks qualifications and she rejected the correct standard of care when forming her opinions, namely a standard of care based on the practice of law in New York. However, Cox's background as a lawyer admitted to practice before the USPTO since 2001 and familiar with patent law qualifies her qualified to testify in this matter about differences between a 35 U.S.C. § 111 and a 35 U.S.C. § 371 patent application and respective benefits. See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81 (2d Cir. 1997) ("In admitting expert testimony, a trial court must determine whether the expert's reasoning and methodology can appropriately be applied to the facts of the case before it."); Keenan v. Mine Safety Appliances Co., No. CV-03-0710, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006) ("The qualifications necessary to testify as an expert are minimal . . . [D]isputes about an expert's credentials go to the weight, not the admissibility, of [her] testimony.") (citations omitted). Moreover, the deposition testimony upon which Kenyon relies to argue that Cox applied the incorrect standard of care in this case does not establish that Cox's expert testimony rested on improper bases. See Cox. Tr. 60-61. Cox correctly "presume[d] that it would be New York law" that would ultimately apply to this legal malpractice action but explained that it was relevant how "a reasonably careful patent attorney practicing anywhere in the United States would have [acted]; because this is practiced in front of the PTO." Id. at 61. New York law clearly governs this case but Cox is correct that it is relevant to the analysis of legal malpractice before the USPTO under New York law to examine how lawyers across the nation practiced before the USPTO, a federal forum, in 2001. See Canavan v. Steenburg, 566 N.Y.S.2d 960, 962 (App. Div. 1991) ("In our view, while not stating specifically the standard of skill of an attorney practicing at an acceptable level in this State, plaintiffs' expert testimony, setting forth requirements for 'any attorney', was sufficient to establish a prima facie case for malpractice."). Kenyon's own expert, Robert Stoll, relies on statistics pertaining to filings before the USPTO that do not distinguish between those made by New York lawyers and those practicing out-of-state. The objections raised by Kenyon pertain to the weight of Cox's testimony, not its admissibility. The expert testimony and report of Cox are admissible and the motion to strike Cox as an expert is **denied.**

overhaul to the patent laws, any reasonably prudent patent prosecution attorney would have investigated its effect on its existing patent applications and taken appropriate or corrective action as necessary and, more specifically, whether receiving a new application date and the ability to receive a patent term adjustment would benefit applicable clients." Cox Rpt., at 3-4 (Dkt. No. 122, at 6-7). It is Cox's opinion that if Kenyon had acted reasonably in June 2001, Kenyon would have filed a bypass continuation application rather than a national stage application in order to take advantage of the AIPA patent term adjustment provisions for the USPTO's delay. Id. at 4.

At her deposition, ignoring the fact that Kenyon was instructed by Mr. Treloar in June 2001 to enter the "national stage" in the United States of Portus's international patent, Cox opined that Mr. Magistre, the Kenyon attorney "should have known of the law change [when the AIPA became effective], and he should have done it another way." Cox Tr. (McCoy Decl., Ex. C) 23-24. Cox further stated that "[t]here was no downside to doing [a Section 111 application] as compared to the 371. And there was plenty of downside to doing the 371. And if they weren't sure, at absolute worst, instead of doing the 111 they could have done the 371 and the 111 at no cost." Id. at 24. The basis for Cox's conclusion that had Kenyon acted reasonably it would

28

have filed the application under 35 U.S.C. § 111 was based on her own understanding of the state of the law in 2001 through the statutes and guidance from the USPTO. Id. at 24-29. Cox also looked to the USPTO 2014 decision denying Kenyon's petition to convert as the "best evidence" for why Kenyon acted unreasonably in June 2001. Id. at 47, 52.

Cox's opinion does not undermine the conclusion that no reasonable juror could find that Kenyon acted unreasonably when it filed a national stage application in June 2001 based on the direction it received from Mr. Treloar. Cox's testimony is that Kenyon acted unreasonably when it filed the patent application under 35 U.S.C. § 371 because the optimal way to proceed would have been through an application under 35 U.S.C. § 111. But in arriving at this conclusion, Cox draws exclusively on her own legal research, conducted during the course of this litigation, about what would have produced a better result for Portus now that Cox knows, with the benefit of hindsight, that the USPTO delayed an initial action on the patent application by more than three years. But Cox's opinion is based purely on a determination that would hold Kenyon to a "standard of 'infallibility'" based on knowledge of facts only gained with the benefit of hindsight. See Nomura Asset Capital Corp., 889 N.Y.S.2d 506(Table), at *11. Further, Cox does not provide any

testimony to rebut Stoll's testimony that there are advantages associated with national stage applications not available to continuation bypass applications. Nor does Cox rebut Stoll's testimony that it is impossible to foresee delays in USPTO action, and therefore that it was not possible to foresee in June 2001 how much patent term adjustment would be lost by filing a national stage application in June 2001 rather than a continuation bypass application.[11] Finally, Cox's reliance on the 2014 USPTO decision to explain why Kenyon acted unreasonably in 2001 is misplaced for the same reasons explained above because Cox relies on a standard of care derived from the USPTO's hindsight analysis in 2014 rather than an analysis of the circumstances known to Kenyon in June 2001 including the instructions Kenyon received from Mr. Treloar at that time.

Thus, Cox's opinion, based purely from the perspective of "perfect vision and wisdom of hindsight," see Darby, 739 N.E.2d at 749 (citation omitted), that a 35 U.S.C. § 111 bypass continuation application should have been pursued is insufficient to support a reasonable jury's finding of negligence. "While [Portus and Cox] pose[] [an alternative] which might have been pursued by [Kenyon], selection of one

---

[11] In this case, Portus was nonetheless afforded 173 days of additional patent term by the USPTO for a filing that pre-dated that effective date of the AIPA.

among several reasonable courses of action does not constitute malpractice." <u>Rosner v. Paley</u>, 481 N.E.2d 553, 554 (N.Y. 1985); <u>see also</u> <u>Brookwood Cos., Inc. v. Alston & Bird LLP</u>, 49 N.Y.S.3d 10, 15 (App. Div. 2017) (finding no malpractice when the attorneys could have pursued multiple courses of action, all of which were reasonable, but one outcome was preferable to the plaintiff based on a hindsight determination).

Kenyon's conduct did not fall below the "ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" in New York in 2001 when Kenyon, with two days to execute Portus's "**URGENT**" instruction to "enter the National Phase," applied under 35 U.S.C. § 371, as 87% of contemporaneous similarly-situated applicants did. <u>See</u> <u>Rich Products Corp. v. Kenyon & Kenyon, LLP</u>, 9 N.Y.S.3d 513, 514 (App. Div. 2015) (granting summary judgment on a claim for legal malpractice because the patent attorney was not negligent when measured at the time of representation). No reasonable jury could conclude otherwise.

Thus, Portus has failed to establish that, on the undisputed facts of this case, a reasonable jury could find that Kenyon was negligent, given the scope of the engagement, either when Kenyon failed to advise Portus about the advantages and disadvantages associated with filing a national stage or

continuation bypass application in June 2001 or when Kenyon went
ahead and filed a national stage application in June 2001.[12]

**B.**

With respect to the third element of a legal malpractice
case, the plaintiff must offer more than "[m]ere speculation
about a loss resulting from an attorney's alleged omission."
Giambrone v. Bank of New York, 677 N.Y.S.2d 608, 610 (App. Div.
1998). The plaintiff must prove the existence of "actual and
ascertainable damages" and, therefore, "[a]bsent proof of actual
damages, a claim for attorney malpractice is unsupportable."
Ressis v. Wojick, 481 N.Y.S.2d 507, 509 (App. Div. 1984).

---

[12] At oral argument, Portus disclaimed any argument that Kenyon was negligent
because of a continual failure to convert the application pursuant to 35
U.S.C. § 371 to an application pursuant to 35 U.S.C. § 111 during the period
following June 17, 2001 when the application was filed until December 2014
when the application was finally granted. Tr. at 35. Rather, Portus
emphasized at oral argument that its claim for negligence rests solely on
Kenyon's conduct in June 2001, namely that Kenyon was negligent in filing the
application as a 35 U.S.C. § 371 application and in failing to advise Portus
adequately. In any event, Kenyon was not negligent during the time period
following June 2001 for similar reasons that it was not negligent in June
2001. The scope of Kenyon's representation never changed from the initial
engagement letter sent by Mr. Treloar to Kenyon in June 2001. Moreover, that
letter instructed Kenyon that "[i]n the absence of our specific instructions
please keep this application in force." Kenyon did exactly that by continuing
to prosecute the patent application after the non-final rejection in 2005 and
ultimately succeeded in getting the application granted in 2014. Finally, the
fact that Kenyon attempted to convert the application to a bypass
continuation application in August 2014 does not mean that it was negligent
in failing to do so earlier. As explained above, that would substitute a
standard of care based on retrospective facts for one based on
contemporaneous circumstances, in violation of New York law.

Summary judgment should also be granted to the defendant because the alleged damages in this case are based on expert testimony that is inadmissible and in any event no reasonable juror could find that Portus has proffered sufficient evidence to prove "actual and ascertainable damages" rather than simply speculation.

**1.**

As an initial matter, Kenyon moves to strike that part of Lewis's expert testimony and report that purported to make firm damages calculations. Kenyon is correct that Lewis's testimony and damages calculations are inadmissible under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Portus asserts that it suffered an injury in the form of the "lost" three-and-a-half years of additional patent term on the '526 patent, and that the loss will cost Portus between $9.1 million and $30.5 million. Lewis Rpt., at 35 (Dkt. No. 122, at 47).[13] Portus's expert, Justin Lewis, arrived at this conclusion by projecting Portus's "enforcement campaign revenue and its

---

[13] Portus also submitted the expert report of Ryan Zurek to "assess the potential terms of a fundraising agreement that Portus could reasonably expect to receive in connection with an enforcement/licensing campaign for its intellectual property." Zurek Rpt., 3 (Dkt. No. 122, at 79). Zurek concluded that "a litigation funder would consider the methodology applied by Mr. Lewis to be a reasonable determination of potential revenues that Portus would secure through its enforcement campaign." Id. at 12. Kenyon did not move to strike Zurek's report.

discounted present value," into the future over the course of the "lost" patent term. Id. at 23. In particular, Lewis forecasted that Portus would be able to enforce its patent in the market for Smart Home technologies against the largest market players, which Lewis asserted are infringing the '526 patent, and that Portus would have an estimated 34% success rate. Id. at 23-25. Lewis's report and his damages calculations proceeded from the following set of premises:

> Portus considers much of the Smart Home market revenue to be infringing the '526 Patent, however it is not feasible to extract licensing revenue from the entire market, due to the large number of companies within the Smart Home market. My model anticipates that after securing initial licenses, it would focus its efforts primarily on the largest market players. These large companies allow Portus to reach at least 30 percent of the Smart Home market as part of its licensing/enforcement campaign.

Id. at 24. Thus, Lewis's calculated damages depend on Portus's own determinations that much of the Smart Home market, which Lewis believes ranged from $37 billion to $84 billion globally in 2017, infringe on the '526 patent. Id. at 19, 24.

However, Lewis is not a lawyer, let alone a patent lawyer, but rather he is a public accountant certified in California whose expertise is in the analysis and quantification of economic damages arising from intellectual property-type cases. Lewis Rpt., App. B. Lewis is therefore not qualified under Daubert to opine on a fundamental premise of his damages report,

34

namely that "much of the Smart Home market revenue [is] infringing the '526 patent" and that Portus's enforcement strategy would succeed against the infringing "largest market players." See Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP, No. 08-cv-0931, 2014 WL 12788845, at *3 (E.D.N.Y. Mar. 31, 2014) ("[T]he court must confirm that the challenged opinions are on issues or subjects that are within the expert's area of expertise."). His opinion that much of the smart home market infringes the '526 patent is further inadmissible because Lewis's source for the proposition that much of the market is infringing the '526 market appears to be the personal belief of Portus's principal. See Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) (citing cases finding that an expert may not simply transmit hearsay to the jury and therefore "[a]n expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."). Lewis points to no finding by any court that any participant in the Smart Home Market is infringing the '526 patent, much less 30% of the market.

Further, the undisputed facts in the summary judgment record are that the four "enforcement" actions have so far yielded $100,000 to Portus during the United States patent term

35

beginning in 2014 and that the sale of three sublicenses has
yielded $150,000.[14] To conclude, as Lewis does, that an
additional three-and-a-half-year term in which licenses could be
issued and enforcement actions initiated would gross roughly
between $9 million and $30 million is based on assumptions that
are "so unrealistic and contradictory as to suggest bad faith"
and thus are essentially "an apples and oranges comparison."
Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir.
1996) (per curiam) (quotation marks and citation omitted).
Lewis's opinions and conclusions are "based on data, a
methodology, or studies that are simply inadequate to support
the conclusions reached [and] Daubert and Rule 702 mandate the
exclusion of that unreliable opinion testimony." Amorgianos v.
Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).[15]
Therefore, Kenyon's motion to strike Lewis's purported testimony
is **granted.**

---

[14] At oral argument, counsel for the plaintiff claimed that Portus has
collected somewhat more than $500,000 through enforcement actions to date. In
subsequent filings with the Court following oral argument, Portus has offered
evidence that the enforcement actions have yielded $510,000 to Portus through
settlement agreements.

[15] Kenyon's rebuttal expert, Mark Peterson, explains how and why Lewis's
methodology is flawed. McCoy Decl., Ex. F, at 3; Id., Ex. F-2, 16-39.
Specifically, Peterson notes that Lewis simply assumes that the vast majority
of products in the identifiable market are infringing the '526 patent and
that Lewis fails to account for the fact that Portus has derived no income
from the Australian patent.

Without the ability to rely on Lewis's inadmissible report, Portus has failed to establish an essential element of its legal malpractice claim, namely that Portus will suffer "actual and ascertainable damages" as a result of Kenyon's alleged negligence, because Portus points to no other admissible evidence in the record to establish that it will suffer actual and ascertainable damages based on Kenyon's alleged negligence. See Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence.").

## 2.

In any event, Lewis's calculations do not establish that the damages in this case resulting from Kenyon's alleged negligence are "actual and ascertainable" rather than mere "speculation about a loss resulting from an attorney's alleged omission." Giambrone, 677 N.Y.S.2d at 609. It is plain from the evidence in the record that the alleged damages are not "actual and ascertainable." The undisputed facts pertaining to Portus's patent-related income are that the Australian patent issued in 2003. From 2012 onward, Portus focused exclusively on a "monetization" strategy. From 2012 onward, Portus received no

income from its Australian operations and its Australian patent. Portus received income from the sale of three sub-licenses in 2016 for a total of $150,000, and Portus received $510,000 from the four enforcement actions Portus has initiated since the '526 patent was issued in 2014.

The undisputed facts demonstrate that in the roughly five years that have elapsed from the issuance of the '526 patent to the filing of this motion, Portus has recouped patent-related income at uncertain intervals and in exceedingly small quantities. There has never been a steady stream of income on the '526 patent and the alleged monetization program itself is only a few years old. These undisputed facts provide no sound basis to determine what, if any, damages were caused by the fact that Kenyon did not obtain an additional three-and-a-half years of patent term by filing a 35 U.S.C. § 111 application in June 2001. The alleged damages are "too speculative and incapable of being proven with any reasonable certainty." Brown v. Samalin & Bock, P.C., 563 N.Y.S.2d 426, 426-27 (App. Div. 1990); cf. Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Grp. N.V., 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998) ("Although the standard of reasonable certainty applies equally to both established and new businesses, new businesses must meet a higher evidentiary burden in satisfying this standard for the obvious reason that

there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.") (internal quotation marks omitted), <u>aff'd</u>, 205 F.3d 1323 (2d Cir. 1999). Therefore, no reasonable juror could conclude that the damages in this case are "actual and ascertainable" in this case.

Because Kenyon has carried its burden of demonstrating that, based on the undisputed facts, the plaintiff has failed to establish that the defendant was negligent or that there were actual and ascertainable damages from the alleged negligence, Kenyon's motion for summary judgment is **granted.**

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not discussed, they are either moot or without merit. The plaintiff's motion to strike the expert testimony of Robert Stoll is **denied.** The defendant's motion to strike the expert testimony of Justin Lewis is **granted.** The defendant's motion to strike the expert testimony of Clare Cox is **denied.** The defendant's motion for summary judgment is **granted.** The Clerk is directed to enter judgment for the

defendant dismissing this case. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

**Dated:     New York, New York**
**            March 27, 2020                 ___/s/ John G. Koeltl_____**
**                                              John G. Koeltl**
**                                    United States District Judge**